Case 4:07-cr-00030-HLM-WEJ   Document 1   Filed 10/25/07   Page 1 of 9

AO 91 (Rev. 5/85) Criminal Complaint

FILED IN CHAMBERS
U.S.D.C. Rome

OCT 25 2007

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA
v.

ANTONIO QUINTERO,
CRISTOBAL QUINTERO,
ROLANDO GODOY,
ROGELIO PIMENTEL,
FRANCISCO MERAZ, a/k/a Kiko,
JESSIE MERAZ,
MARIO LOPEZ, a/k/a Loco,
NOE MARTINEZ, and
FNU LNU

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 4:07-MJ-083

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about <u>July 17, 2006, and continuing until on or about September 25, 2007,</u> in <u>Whitfield</u> County, in the Northern District of Georgia defendant(s) did, Track Statutory Language of Offense)

conspire to possess with intent to distribute at least 50 grams of methamphetamine, a Schedule II controlled substance,

in violation of Title <u>21</u> United States Code, Section(s) <u>846</u>.

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof.   (X) Yes ( ) No

Signature of Complainant
Matthew R. Rhue

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

October 25, 2007                           at   Rome, Georgia
Date                                            City and State

Walter E. Johnson
United States Magistrate Judge
Name and Title of Judicial Officer            Signature of Judicial Officer
AUSA PAUL R. JONES

## AFFIDAVIT

1. Your Affiant, Matthew R. Rhue, has been employed as a Special Agent (SA) of the Federal Bureau of Investigation (FBI) for approximately three years and is currently assigned to investigate several classifications of crimes, to include drug violations. Prior to employment with the FBI, SA Rhue was employed by the Drug Enforcement Administration (DEA) as a Special Agent for approximately two and a half years. Prior to being employed with the DEA SA Rhue was employed by the Charleston Police Department in Charleston, South Carolina, for approximately five and a half years.

2. Information contained in this Affidavit is provided by the Affiant and law enforcement officers of the Whitfield County Georgia Sheriff's Office (WCSO) and the City of Dalton Police Department (DPD), Dalton, Georgia:

3. This affidavit is in support of the criminal complaints against, and arrest warrants for, Antonio Quintero, Cristobal Quintero, Rolando Godoy, Rogelio Pimentel, Francisco Meraz a/k/a Kiko, Jesus Meraz, a/k/a Jessie, Mario Lopez a/k/a Loco, Noe Martinez, and FNU LNU for violations of Title 21, United States Code, Section 841(a)(1): to knowingly and willfully possess with intent to distribute a controlled substance; and of Title 21, United States Code, Section 846: to attempt or to conspire to commit a violation of Title 21, that is, a violation of Title 21, United States Code, Section 841(a)(1). This affidavit is intended to show that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of, or investigation into, this matter.

4. Law Enforcement Officers (LEOs) learned that persons in the City of Dalton/ Whitfield County, which is located in the Northern District of Georgia, were distributing significant quantities of methamphetamine. Your affiant knows that methamphetamine is a Schedule II controlled substance. Throughout this investigation, LEOs utilized four Cooperating Witnesses (CW) to verify that persons were distributing controlled substances and to make controlled purchases. Before each controlled purchase, the CW was searched to make sure that it had no controlled substances on its person. After each controlled purchase, the CW gave the suspected controlled substance to LEOs, and the CW was searched again to make sure that there were no other controlled substances on its person. The CW's vehicle was searched before and after each purchase, always with negative results. LEOs did surveillance on

1

each controlled purchase made by the CW. Each purchase was made in Whitfield County, and the CW was provided with pre-recorded LEO funds (FBI, WCSO, or DPD funds) to make each purchase. A recording device was activated and given to the CW to place on their person prior to each controlled purchase. During the controlled drug purchases, consensually recorded telephone calls where made and all controlled drug purchases where audio recorded

5. On July 17, 2006, CW#1 was approached by Cristobal Quintero in reference to selling CW#1 drugs ("ice" methamphetamine, cocaine, and/or marijuana) On July 20, 2006, Cristobal Quintero and Antonio Quintero met CW#1. Antonio Quintero discussed the prices for the different quantities of each drug. Antonio and Cristobal Quintero provided the CW with a sample of "ice" methamphetamine and cocaine. The samples were turned over to LEO, and both field tested positive.

6. In December 2006, Rolando Godoy, who at that time was attempting to cooperate with LEOs, advised that Antonio and Jesus Quintero were in the drug business and that their brother-in-law, known to Godoy as "Pelon," later identified as Rogelio Pimentel, was in the drug business with Antonio and Jesus. Godoy stated that Pimentel drove a green Nissan Titan with Georgia license plate number AMN5185. The tag came back to 607 Crestview Drive, Dalton, Georgia. This address is the residence of Antonio and Jesus Quintero's father. Godoy stated that Pimentel's Nissan Titan is used to transport drugs from Atlanta to Dalton, Georgia. Godoy reported that the drugs are sometimes stored at 106 North Castle Drive, Dalton, Georgia. Public source information reported that 106 N. Castle Drive was associated with Mario Lopez in 2006.

7. On January 25, 2007, CW#2, met with LEOs in reference to making a controlled "ice" methamphetamine purchase from a Hispanic male that CW#2 had met previously with CW#2's drug supplier. CW#2 went with its supplier to "Dalton Wholesale Tire," on Murray Avenue in Dalton, Georgia, where the Hispanic male provided what appeared to be "ice" methamphetamine to the CW's drug supplier. "Dalton Wholesale Tire" was believed to be the business operated by Antonio Quintero. LEOs identified the individual who supplied the "ice" methamphetamine as Rolando Godoy. Under the direct supervision of LEOs, CW#2 telephonically contacted Rolando Godoy. CW#2 asked for one ounce of "ice" methamphetamine and Godoy agreed. A short time later, another Hispanic male called CW#2 back on behalf of Godoy and arranged to meet CW#2. The Hispanic male, who was never

2

identified, instructed CW#2 when and where to meet in order for CW#2 to purchase the one ounce of "ice" methamphetamine. CW#2 met a Hispanic male at the instructed location. CW#2 advised the Hispanic male that it only had $1300.00 and asked if that amount of money was ok. The Hispanic male stated he "guessed so." CW#2 purchased one ounce of "ice" methamphetamine from the Hispanic male for $1,300.00. LEO conducting surveillance observed the Hispanic male drive up in a dark colored Ford Explorer with Georgia license plate number ADE9672. The vehicle was registered to Augistina Rosilas, who LEOs determined is Godoy's wife. CW#2 turned over the suspected "ice" methamphetamine to investigators. The substance field tested positive for the presence of methamphetamine and weighed 28.3 gross grams.

8. On January 31, 2007, under the direct supervision of LEOs, CW#1 contacted Antonio Quintero to arrange a one-ounce purchase of "ice" methamphetamine. Antonio Quintero explained to CW#1 that he did not have any "ice" methamphetamine with him at the time, but advised CW#1 to come by his auto mechanic shop later in the evening. Antonio explained to CW#1 that by then, he would have some more "ice" methamphetamine ready to be sold. Still under LEOs supervision, CW#1 went to Quintero's shop later the same day. CW#1 pulled its vehicle into the garage bay and met with Antonio Quintero. Antonio and CW#1 talked about the quantity CW#1 needed and the price Antonio Quintero was charging. Antonio requested the money up front, and CW#1 paid Antonio Quintero the money that was agreed upon. While talking to CW#1, Antonio Quintero received a telephone call and he instructed the person on the other end of the phone call to bring a "whole car" to the shop. A Hispanic male, later identified as Mario Lopez, also known as "Loco," walked into the garage area and Antonio advised Mario to check the weight. Antonio Quintero instructed Mario Lopez to make sure it weighed 28 grams. Mario returned and placed the "ice" methamphetamine in the CW's glove box of the CW's vehicle. CW#1 met back with law enforcement and turned the suspected "ice" methamphetamine over to investigators. The substance field tested positive for the presence of methamphetamine and weighed 28 gross grams.

9. On February 5, 2007, CW#2 contacted LEOs and informed them that it had gone by Antonio Quintero's mechanic shop and at that location Rolando Godoy had given it three ounces of "ice" methamphetamine unexpectedly. Godoy told CW#2 that CW#2 did not have to pay for the three ounces at the time, but that CW#2 could repay him as CW#2 sold it. (Godoy had "fronted" CW#2 the "ice" methamphetamine.) CW#2 turned over the suspected "ice" methamphetamine to WCSO investigators. The

3

substance weighed approximately 84 gross grams and field tested positive for the presence of methamphetamine. On February 6, 2007, under direct LEO supervision, CW#2 made one of the controlled payments for the three ounces of "ice" methamphetamine that Godoy had "fronted" CW#2. CW#2 met with Rolando Godoy and paid him $800.00. CW#2 informed Godoy that the "ice" methamphetamine was of very poor quality. Godoy nodded in agreement and told CW#2 that better stuff was coming up from Atlanta but that it would cost more. CW#2 understood Godoy was referring to better quality "ice" methamphetamine.

10. On February 1, 2007, LEOs met with CW#3, who stated that on January 31, 2007, a Hispanic male who introduced himself as "Pelon" approached CW#3 and wanted CW#3 to sell drugs for him. Pelon quoted some drug prices for different quantities of both cocaine and "ice" methamphetamine. CW#3 stated "Pelon" drove a green Nissan Titan with Georgia license plate number AMN5185. The vehicle was registered to Rogelio Pimentel. Pimentel advised CW#3 that he was part owner of a mechanic shop on Murray Avenue. He stated to CW#3 that he was giving his part of the shop to his supplier because of a drug debt. The name of the mechanic shop is Dalton Wholesale Tire.

11. On February 9, 2007, under LEO supervision, CW#3 met with Pimentel. During the conversation, Pimentel quote a price for a certain amount of "ice" methamphetamine that he would sell to CW#3. Pimentel stated that he and his brother, who was not identified, were making about $30,000.00 in drug profits. Pimentel stated that his brother in law bought some drugs and refused to pay the drug supplier. The drug supplier came up from Atlanta and repossessed his vehicle.

12. A national comprehensive report from a public source database reflects that Rogelio Pimentel has a possible association with 111 Alma Drive, Dalton, Georgia. LEOs have observed Pimentel's green Nissan Titan parked overnight in front of that residence on numerous occasions throughout the investigation. Through CW and source information, LEOs believe that Maria Quintero is married to Rogelio Pimentel. Maria Quintero is also associated with 607 Crestview Drive, Dalton, Georgia and 111 Alma Drive, Dalton, Georgia. Pimentel's vehicle has been observed by LEO at Antonio Quintero's mechanic shop on numerous occasions.

13. On March 1, 2007, CW#3, under direct LEO supervision, telephonically contacted Rogelio Pimentel to arrange a purchase of one ounce of "ice"

4

methamphetamine. Pimentel told CW#3 that he had to call his brother and would call CW#3 back. Pimentel wanted to meet CW#3 at a certain location, but CW#3 requested a different location to conduct the drug transaction. Pimentel then instructed CW#3 to contact his brother to discuss the deal. The individual Pimentel was referring to was later identified to be Noe Martinez. Pimentel then provided Noe Martinez's telephone number to CW#3. CW#3 telephonically contacted Martinez and agreed upon a location. A short time later, CW#3 met with Noe Martinez and purchased the ounce of "ice" methamphetamine for $1,000.00. CW#3 and Noe discussed further drug transactions and Noe advised CW#3 to go through Pimentel, unless Pimentel instructed CW#3 differently. CW#3 left the location and met back with law enforcement. CW#3 turned over the suspected "ice" methamphetamine to investigators. The substance field tested positive for the presence of methamphetamine and weighed 27.1 gross grams. CW#3 described Noe as a Hispanic male having a thin mustache and being heavy set.

14. On March 23, 2007, CW#4 advised LEO that it met "Tony" (Antonio Quintero) and "Orlando" (Rolando Godoy) a year earlier. CW#4 advised that they worked at an auto mechanic shop in Dalton, Georgia and described Dalton Wholesale Tire, Quintero's shop, located at 1607 Murray Avenue. CW#4 stated that it began to purchase drugs from both Quintero and Godoy. While dealing with Antonio Quintero and Godoy, CW#4 stated that it was introduced to a Hispanic male by the name of "Noe." CW #4 described Noe LNU as heavy set, Hispanic, in his twenties or early thirties. CW#4 was told that Noe was going to start delivering drugs for them. Another individual that CW#4 saw several times Dalton Wholesale Tire was a Hispanic male who drove a white mustang. CW#4 stated that whenever it went to Quintero's shop to purchase drugs and neither Quintero nor Godoy had the drugs, CW#4 would shortly afterwards see this Hispanic male arrive to meet with Quintero and/or Godoy. At that point Quintero would have drugs to sell to CW#4. LEO have observed Mario Lopez driving a white mustang during this investigation.

15. On May 3, 2007, CW#4, under the direct supervision of LEOs, telephonically arranged a purchase of one ounce of "ice" methamphetamine from Antonio Quintero. Shortly thereafter, CW#4 met with Antonio Quintero where Antonio Quintero had instructed CW#4 to meet. Cristobal Quintero was with Antonio Quintero when they met CW#4. While CW#4 and Antonio talked, Cristobal Quintero had placed the "ice" methamphetamine into CW#4's vehicle. After the discussion, Antonio Quintero advised CW#4 that the "ice" methamphetamine was in the CW's

vehicle. Antonio Quintero also advised CW#4 to pay for the "ice" methamphetamine later. CW#4 turned over the suspected ice methamphetamine to LEOs. The substance fielded tested positive for the presence of methamphetamine and weighed 28.3 gross grams. Later that day, Antonio Quintero contacted CW#4 and instructed CW#4 where to meet in order for CW#4 to pay him. Under LEO supervision, CW#4 arrived at the instructed location and met with Cristobal Quintero, who told CW#4 that Antonio Quintero had sent him to pick up the money. CW#4 paid Cristobal Quintero $1,200.00 for the ounce of "ice" methamphetamine that it had received earlier.

16.   On May 11, 2007, CW#4, under the direct supervision of LEOs, attempted to telephonically contact Antonio Quintero on Antonio Quintero's cellular telephone. Several minutes later, Antonio Quintero called CW#4 back. CW#4 advised that it needed two ounces of "ice" methamphetamine. Due to previous drug transactions with Antonio Quintero, CW#4 knew how much Antonio Quintero would charge it for the two ounces. It was understood that two ounces would cost $2,400.00. Antonio Quintero instructed CW#4 where to go. CW#4 thought that Antonio Quintero was going to meet it, but CW#4 was met by Cristobal Quintero. Cristobal met CW#4 and handed the "ice" methamphetamine to CW#4. CW#4 paid Cristobal $2,400.00 for the two ounces of "ice" methamphetamine. CW#4 turned over the suspected ice methamphetamine to LEOs. The substance fielded tested positive for the presence of methamphetamine and weighed 55.2 gross grams.

17.   On May 18, 2007, CW#4, under LEO supervision, placed a telephone call to Antonio Quintero's cellular telephone. Antonio Quintero answered the phone and CW#4 asked him if he, Tony, had one ounce of "ice" methamphetamine to sell. Antonio told CW#4 that he would call CW#4 back. Approximately 28 minutes later, Antonio Quintero called CW#4 back. Antonio Quintero advised CW#4 that the ounce of "ice" methamphetamine would be ready to be picked up at N&R Audio Electronics and Customs located at 2804 Walnut Avenue, Dalton, Georgia. Antonio Quintero advised CW#4 to ask for "Jessie," who would have the "ice" methamphetamine. Antonio directed CW#4 to give Jessie the money and Jessie would give CW#4 the "stereo," which CW#4 understood to mean the ounce of "ice" methamphetamine. CW#4 met with an individual who acknowledged that he was Jessie and stated that he had "it," referring to the "ice" methamphetamine. Jessie told CW#4 that CW#4 was supposed to have the money. CW#4 stated that it did have the money. Jessie removed the ice from his pants pocket and placed it on the floorboard of the vehicle he was installing a stereo in. Jessie then instructed CW#4 to place the money ($1,200.00) on

the floor board next to the ice methamphetamine. CW#4 retrieved the ice methamphetamine and walked away. CW#4 then turned around and observed Jessie counting the money. CW#4 turned over the suspected "ice" methamphetamine to LEOs and it field tested positive for the presence of methamphetamine. The substance weighed 24.5 gross grams. Jessie was later identified by LEO to be Jesus Meraz.

18. On June 22, 2007, under the direct supervision of LEOs, CW#4 telephonically contacted Antonio Quintero to arrange a purchase of one ounce of "ice" methamphetamine. Antonio Quintero instructed CW#4 to go N&R and that an individual by the name of "Kiko" would be waiting for CW#4. CW#4 went to the location and "Kiko" (later identified to be Francisco Meraz) was waiting for CW#4. CW#4 met with Francisco Meraz and conducted the drug transaction of one ounce of "ice" methamphetamine. CW#4 paid Meraz $1,200.00. CW#4 departed the location and met back with law enforcement. CW#4 turned over the suspected "ice" methamphetamine to investigators. The substance field tested positive for the presence of methamphetamine and weighed 27.3 gross grams.

19. On September 25, 2007, under the direct supervision of LEOs, CW#4 telephonically contacted Antonio Quintero and advised that it needed one ounce of "ice" methamphetamine. Antonio Quintero advised that he had one ready. Antonio Quintero instructed CW#4 to meet him at Glenwood Ave. in Dalton, which LEOs believed to be the location of Quintero's new auto mechanic shop. CW#4 drove to the location and met with Antonio Quintero. Quintero directed CW#4 to follow another Hispanic male, FNU LNU. The Hispanic male went back into the body shop part of the auto mechanic shop and retrieved an ounce of "ice" methamphetamine. CW#4 handed FNU LNU $1,200.00 and walked out. CW#4 turned over the suspect "ice" methamphetamine to LEO. The substance field tested positive for methamphetamine and weighed 28.6 gross grams. CW#4 described FNU LNU as a Hispanic male, twenties/early thirties, same height as Antonio Quintero, with short black hair, very light beard, and a dark complexion. LEO have conducted surveillance on the shop and have observed the Hispanic male—FNU LNU—work in the body shop.

20. On September 25, 2007, under the direct supervision of LEOs, CW#1 went to Antonio Quintero's shop located at Glenwood Ave. in Dalton, Georgia. On September 25, 2007, CW#1 received a telephone call from Antonio Quintero advising that the "ice" methamphetamine was ready for CW#1 to pick up. When CW#1 arrived, Antonio Quintero advised it to park next to the body shop. The Hispanic male

employee—FNU LNU—who works in the body shop, walked towards the CW's vehicle and placed the "ice" methamphetamine in its vehicle. CW#1 paid FNU LNU the money for the "ice" methamphetamine. CW#1 turned over the suspected "ice" methamphetamine to LEO. The substance field tested positive for methamphetamine and weighed 28.7 gross grams. CW#1 stated FNU LNU is the shop's body shop man. CW described FNU LNU as a Hispanic male, approximately 5'8", about 170 pounds, short dark hair, dark eyes, dark complexion, and in his late twenties. The description given by CW#1 of FNU LNU is the same as the description given by CW#4 in paragraph 19. Through surveillance and description, FNU LNU in paragraph 19 and 20 appear to be the same individual.

FURTHER AFFIANT SAYETH NAUGHT.